United States District Court
Southern District of Texas

**ENTERED**

July 15, 2016

David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| BRENDA LYNETTE TURPIN, | § | |
| | § | |
| Plaintiff, | § | Case No.: 4:15-cv-01922 |
| | § | |
| vs. | § | |
| | § | |
| CAROLYN V. COLVIN, COMMISSIONER | § | |
| OF THE SOCIAL SECURITY | § | |
| ADMINISTRATION, | § | |
| | § | |
| Defendant. | § | |

## MEMORANDUM AND ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND DENYING PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Before the Magistrate Judge[1] in this social security appeal is the Defendant's

Cross Motion for Summary Judgment and Brief in Support of Cross-Motion for

Summary Judgment (Document Nos. 15 & 15-1) and Plaintiff's Motion for Summary

Judgment and Memorandum in Support (Document Nos. 13 & 14). After considering the

cross motions for summary judgment, the administrative record, the written decision of

the Administrative Law Judge, and the applicable law, the Court ORDERS, for the

reasons set forth below, that Plaintiff's Motion for Summary Judgment is DENIED

(Document No. 13), Defendant's Cross Motion for Summary Judgment is GRANTED

(Document No. 15), and the decision of the Commissioner of the Social Security

Administration is AFFIRMED.

---

[1] The parties consented to proceed before the undersigned Magistrate Judge on
September 30, 2015. (Document No. 9)

## I.    Introduction

Plaintiff Brenda Lynette Turpin ("Turpin") brings this action pursuant to the Social Security Act ("Act"), 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of the Social Security Administration ("Commissioner") denying her application for disability insurance benefits.  Turpin argues that substantial evidence does not support the Administrative Law Judge's decision ("ALJ").  Turpin alleges she has been disabled since November 22, 2011, due to severe back and neck pain, as well as carpal tunnel syndrome.  According to Turpin, the ALJ, Gary J. Suttles, did not weigh all of the evidence correctly.  Specifically, Turpin argues that the ALJ failed to properly weigh the medical opinions of her treating physician, Dr. Pucillo.  Additionally, Turpin claims the ALJ failed to properly evaluate Turpin's credibility.  Turpin requests that the decision of the Commissioner be reversed and awarding of benefits, or in the alternative, remanding her claim for further consideration.  The Commissioner responds that substantial evidence supports the ALJ's decision that Plaintiff is not disabled within the meaning of the Act, that the decision comports with applicable law, and that the decision should be affirmed.

## II.    Administrative Proceeding

Plaintiff filed an application for Social Security Disability Benefits ("SSD") on June 13, 2012, claiming an inability to work due to impairments beginning November 22, 2011 (Tr. 171-172).  The Social Security Administration denied her application at the initial and reconsideration stages.  (Tr. 89-90).  On February 1, 2013, Turpin requested a hearing before an ALJ.  (Tr. 101-102).  The Social Security Administration granted her request, and the ALJ, Gary Suttles, held a hearing on November 15, 2013.  (Tr. 52-88).

On January 30, 2014, the ALJ issued an unfavorable decision for Turpin finding her not disabled.  (Tr. 32-51).

Turpin sought review of the ALJ's decision with the Appeals Council.  The Appeals Council will grant a request to review an ALJ's decision if any of the following circumstances are present: (1) it appears that the ALJ abused his discretion; (2) the ALJ made an error of law in reaching his conclusions; (3) substantial evidence does not support the ALJ's actions, findings, or conclusions; or (4) a broad policy issue may effect the public interest.  20 C.F.R. § 404.970; 20 C.F.R. § 416.1470.  On May 7, 2015, the Appeals Council denied the request for review.  (Tr. 1-7).  The ALJ's findings and decision became final.

Turpin has filed a timely appeal of the ALJ's decision.  Both the Commissioner and Turpin have filed a motion for Summary Judgment (Document Nos. 13 & 15).  This appeal is now ripe for ruling.

The evidence is set forth in the transcript, pages 1 through 483.  (Document No. 6).  There is no dispute as to the facts contained therein.

### III.    Standard of Review of Agency Decision

The court's review of denial of disability benefit is limited "to determining (1) whether substantial evidence supports the Commissioner's decision, and (2) whether the Commissioner's decision comports with legal standards."  *Jones v. Apfel,* 174 F. 3d 692, 693 (5th Cir. 1999).  Indeed, Title 42, Section 405(g) limits judicial review of the Commissioner's decision: "The findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  The Act specifically

grants the district court the power to enter judgment, upon pleadings and transcript, "affirming, modifying, or reversing the decision of the Commissioner of Social Security, with or without remanding the cause for a hearing" when not supported by substantial evidence. 42 U.S.C. § 405(g). While it is incumbent upon the court to examine the record in its entirety to decide whether the decision is supportable, *Simmons v. Harris*, 602 F.2d 1233, 1236 (5th Cir. 1979), the court may not "reweigh the evidence in the record nor try the issues de novo, nor substitute [its] judgment for that of the [Commissioner] even if the evidence preponderates against the [Commissioner's] decisions." *Johnson v. Bowen*, 864 F.2d 340, 343 (5th Cir. 1988); *see also Jones*, *174 F.3d at 693*; *Cook v. Heckler*, 750 F.2d 391, 392-93 (5th Cir. 1985). Conflicts in the evidence are for the Commissioner to resolve. *Anthony v. Sullivan,* 954 F.2d 289, 295 (5th Cir. 1992).

The United States Supreme Court has defined "substantial evidence," as used in the Act, to be "such relevant evidence as reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938). Substantial evidence is "more than a scintilla and less than a preponderance." *Spellman v. Shalala*, 1 F.3d 357, 360 (5th Cir. 1993). The evidence must create more than "a suspicion of the existence of the fact to be established, but no 'substantial evidence' will be found only when there is a 'conspicuous absence of credible choice' or 'no contrary medical evidence.' *Hames v. Heckler*, 707 F.2d 162, 164 (5th Cir. 1983).

## IV.     Burden of Proof

An individual claiming entitlement to disability insurance benefits under the Act has

the burden of proving her disability.  *Johnson*, 864 F.2d at 344.  The Act defines

disability as the "inability to engage in any substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result in

death or which has lasted or can be expected to last for a continuous period of not less

than 12 months."  42 U.S.C. § 423(d)(1)(A).  The impairment must be proven through

medically accepted clinical and laboratory diagnostic techniques.  42 U.S.C. § 423(d)(3).

The impairment must be so severe as to limit the claimant in the following manner:

> [S]he is not only unable to do [her] previous work but cannot, considering
> [her] age, education, and work experience, engage in any other kinds of
> substantial gainful work which exists in the national economy, regardless of
> whether such work exists in the immediate area in which [s]he lives, or
> whether a specific job vacancy exists for [her], or whether [s]he would be
> hired if [s]he applied to work.

42 U.S.C § 423(d)(2)(A).  The mere presence of impairment is not enough to establish

that one is suffering from disability.  Rather, a claimant is disabled only if she is

"incapable of engaging in *any* substantial gainful activity."  *Anthony*, 954 F.2d at 293

(quoting *Milam v. Bowen*, 782 F.2d 1284, 1286 (5th Cir. 1986)).

The Commissioner applies a five-step sequential process to decide disability

status:

1. If the claimant is presently working, a finding of "not disabled" must be made;

2. If the claimant does not have a "severe impairment" or combination of impairments [she] will not be found disabled;

3. If the claimant has an impairment that meets or equals an impairment listed in Appendix 1 of the Regulations, disability is presumed and benefits are awarded;

4. If the claimant is capable of performing past relevant work, a finding of "not disabled" must be made; and

5. If the claimant's impairment prevents [her] from doing any other substantial gainful activity, taking into consideration [her] age, education, past work experience and residual functional capacity, [she] will be found disabled.

*Anthony*, 954 F.2d at 293; *see also Leggett v. Chater*, 67 F.3d 558 n.2 (5th Cir. 1995);

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991). Under this formula, the claimant

bears the burden of proof on the first four steps of the analysis to establish that a

disability exists. *Mcqueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). If successful, the

burden shifts to the Commissioner, at step five, to show that the claimant can perform

other work. *Id.* Once the Commissioner shows that other jobs are available, the burden

shifts, again, to the claimant to rebut this finding. *Selders v. Sullivan*, 914 F.2d 614, 618

(5th Cir. 1990). If, at any step in the process, the Commissioner determines that the

claimant is or is not disabled, the evaluation ends. *Leggett*, 67 F.3d at 564.

Here, the ALJ determined that Turpin was not disabled at step five. The ALJ

found that Turpin had not engaged in substantial gainful activity since her alleged onset

date, November 22, 2011. (Step One). At step two, the ALJ found that Turpin's carpal

tunnel syndrome, degenerative disc disease of the cervical and lumbar spine, and obesity

were severe impairments. However, Turpin did not have an impairment or combination

of impairments that met or medically equaled an impairment listed in Appendix 1 of the

Regulations for disability to be presumed. (Step Three). Based on the record and the

testimony of Turpin, the ALJ found that Turpin had the RFC to perform light work

restricted to the extent that she could lift and/or carry ten pounds frequently and 20

pounds occasionally, stand and walk for 4 of 8 hours, each, and sit for six or eight hours,

for a full eight-hour day.  Her ability to push/pull and her gross and fine dexterity are unlimited with the exception of frequent use of the hands, bilaterally.  Additionally, the ALJ found that she could occasionally climb stairs, bend, stoop, crouch, crawl, balance, twist, and squat.  She could occasionally be exposed to dangerous machinery.  She has no mental impairments.  At step four, the ALJ determined she could perform her past relevant work as a medical records clerk, and, in the alternate at step five, that she could perform work as a general office clerk, a factory clerk, and a route delivery clerk.

In determining whether substantial evidence supports the ALJ's decision, the court weighs four factors: (1) the objective medical facts; (2) the diagnosis and expert opinions of treating physicians on subsidiary questions of fact; (3) subjective evidence of pain and disability as testified to by the plaintiff and corroborated by family and neighbors; and (4) the plaintiff's educational background, work history and present age. *Wren*, 925 F.2d at 126.

## V.    Discussion

### a.  Objective Medical Evidence

The objective medical evidence shows that Turpin has the following severe impairments: carpal tunnel syndrome, degenerative disc disease of the cervical and lumbar spine, and obesity.  The record also reflects a history of hypertension.  However, physical examinations have not revealed any ongoing abnormalities related to hypertension.

On September 6, 2011, Turpin sought treatment from Dr. Andrew Lee.  Turpin reported complaints of bilateral numbness and tingling as well as pain with weakness, which she claimed had been present for 1 year, and was worse in her right hand.  (Tr.

263-264, 314-315).  An x-ray showed no obvious bone or joint pathology.  *Id.*  Dr. Lee

noted his findings as follows:

> Right hand–There is no obvious swelling or edema of the hand.  There are
> no deformities. There is no obvious atrophy of the thenar, hypothenar or
> intrinsic muscles. The patient demonstrates full range of motion of the
> wrist and fingers. There is no triggering. Finkelstein's test is negative.
> Phalen's test is positive. Tinel's test is negative. Durkan's or compression
> test is positive.  The patient demonstrates mild decrease in grip and pinch
> strength.  Distal neurovascular examination are normal with normal two-
> point discrimination. Left hand–There is no obvious swelling or edema of
> the hand. There are no deformities. There is no obvious atrophy of the
> thenar, hypothenar or intrinsic muscles. The patient demonstrates full
> range of motion of the wrist and fingers. There is no triggering.
> Finkelstein's test is negative. Phalen's test if positive. Tinel's test is
> negative. Durkan's or compression test is positive. The patient
> demonstrates mild decrease in grip and pinch strength. Distal
> neurovascular examinations are normal with normal two point
> discriminations.

*Id.*

Dr. Lee diagnosed Turpin with carpal tunnel syndrome and Turpin decided to

proceed with surgery on both hands, starting with the right hand.  (Tr. 264).

On this same day, Dr. Lee referred Turpin to Dr. Jamie Guyden for an

electrodiagnostic consultation.  (Tr. 277-280, 298-305).  A physical examination by Dr.

Guyden revealed no thenar or hypothenar muscle atrophy, but the doctor found decreased

sensation to light touch in the medium nerve distribution in the upper right extremity as

well as positive carpal compression bilateral in Turpin's wrists.  *Id.*  An electrodiagnostic

impression for the left upper extremity revealed a mild left sensory demyelinating median

mononeuropathy at the wrist.  *Id.*  An electrodiagnostic impression for the upper right

extremity revealed a moderate right sensorimotor demyelinating median mononeuropathy

at the wrist.  *Id.*  There was no electrodiagnostic evidence of a cervical radiculopathy or

other focal nerve entrapment in either wrist.  *Id.*

Later that month, on September 23, 2011, Turpin underwent an MRI at One Step Diagnostic which showed small disc bulges and protrusions at L3-4, L4-5, and L5-S1 which mildly flattened the ventral thecal sac. (Tr. 336, 374). The MRI also showed mild narrowing of the neural foramen at L4-5 which mildly impinged upon the exiting nerve roots. *Id.* An MRI of the cervical spine on this same visit revealed moderate spondylosis with multiple disc bulges and protrusions. (Tr. 339, 343, 377). The protrusion at C5-6 mildly compressed the cord but did not cause changes in the cord signal. *Id.* The MRI of the cervical spine also revealed unconvertebral joint hypertrophy and foraminal narrowing which mildly impinged on the exiting nerve roots as well as upper thoracic spondylosis. (Tr. 340). Additionally, the MRI revealed 1 centimeter of abnormal signal in the posterior lateral left spinal cord at C3 which Dr. Lee recommended a MRI with IV contrast with thin cut axials through the region for further evaluation. *Id.*

A MRI from One Step Diagnostics on October 5, 2011, revealed a redemonstration of T2 signal abnormality in the cervical spinal cord eccentric to the left at the C3 level measure 4/11 millimeters. (Tr. 337-338, 341-342, 375-376). There is no concomitant enhancement within this focus or expansion of cord. *Id.* This could represent a chronic demyelinating lesion or may represent a focus of myelomalacia. *Id.* There was additional redemonstration of disc and unconvertebral pathology, which was most significant at the C4-C5 and C5-C6 levels with moderate central canal stenosis, central disc protrusions and moderate bilateral foraminal narrowing with probable contact of the exiting bilateral C5 and C6 nerve roots. *Id.* Lastly, this MRI found redemonstration of small central disc protrusion at the C3-C4 level with mild canal stenosis and mild foraminal narrowing. *Id.*

On November 22, 2011, Turpin underwent intracarpal decompression and decompressive volar fasciotomy of her right hand. (Tr. 285-288, 310-313). At her follow up appointment for the surgery on December 1, 2011, Turpin demonstrated a good range of motion on all fingers for her right hand. (Tr. 265-268, 316-317). Dr. Lee noted that the incisions were healing well and swelling and edema were minimal. *Id.* Distal neurovascular examination was normal with intact 2 point discriminations. *Id.* At this appointment, Turpin demonstrated the same mild decrease in grip and pinch strength and a full range of motion in her fingers and wrist for her left hand. *Id.* Dr. Lee made the same findings on Turpin's left hand as he did on September 6, 2011. *Id.* Dr. Lee informed Turpin of her treatment options, and Turpin elected to undergo the same surgery on her left hand as she had undergone for her right hand. *Id.*

Following this discussion, Turpin underwent intracarpal decompression and decompressive volar fasciotomy on the left hand on December 27, 2011. (Tr. 281-284, 306-309). At a follow up appointment on January 5, 2012, Dr. Lee found the incisions to be healing well with minimal swelling and edema. (Tr. 269-270, 318-319). At this time, Turpin demonstrated a good range of motion on all fingers and her distal neurovascular examination was normal with intact 2 point discriminations. *Id.* Turpin did not have any complaints at this time. *Id.*

On February 7, 2012, Turpin reported continued tenderness in both hands. (Tr. 271-272). Dr. Lee reported that she was doing well except for some scar tissue reaction. *Id.*

Shortly thereafter, Turpin visited Dr. Lee on March 6, 2012 with complaints of ongoing pain over the scars in both hands. (Tr. 273-274, 320-321). Again, Dr. Lee found

the incisions to be healing well with minimal swelling and edema, and no signs of

infection. *Id.* Turpin demonstrated a good range of motion on all fingers with normal

distal neurovascular with intact two point discriminations. *Id.* The only difference Dr.

Lee found during this visit in comparison to previous visits was tenderness over the scars

on Turpin's left hand. *Id.*

On April 3, 2012, Turpin visited Dr. Lee with continued numbness and tingling in

the left hand but her right hand was fine. (Tr. 275-276). A physical examination

revealed positive Phalen's and and compression tests. *Id.* Turpin continued to

demonstrate a good range of motion in all fingers and the distal neurovascular

examination was normal. *Id.* Dr. Lee wrote that he was "afraid that [Turpin] ha[d]

persisting CTS on the left side." *Id.*

On August 9, 2012, Kim Rowlands, M.D., completed a Physical Residual

Functional Capacity Assessment. (Tr. 289-296). Dr. Rowlands found no exertional

limitations, communicative limitations, or environmental limitations. *Id.* Dr. Rowland

assessed that Turpin had manipulative limitations that limited her fingering and feeling.

*Id.* Her reaching and handling were unlimited. *Id.*

Turpin's next visit to Dr. Lee was on September 18, 2012, where she complained

of continued tingling and numbness in the left hand despite taking anti-inflamatories and

wearing a brace. (Tr. 322). Turpin did not report any issues with her right hand nor did

the examiner find any issues. *Id.* A physical examination revealed tenderness over the

surgical scars and positive Phalen's and compression tests for the left hand. *Id.* Turpin

demonstrated a good range of motion in all fingers and her distal neurovascular

examination presented normal results. *Id.* Dr. Lee diagnosed persisting carpal tunnel

syndrome in the left hand. *Id.* At this time, Turpin stated that she wanted to proceed with another surgery on her left hand. *Id.* The discussed surgery never took place, and this September 2012 visit was Turpin's last visit to Dr. Lee for treatment.

On December 17, 2012, another Physical Residual Functional Capacity Assessment was completed by Robin Rosentock, M.D. (Tr. 323-330). Dr. Rosenstock opined that Turpin had no postural limitations, visual limitations, communicative limitations, or environmental limitations. *Id.* Contrary to the previous physical RFC completed by Dr. Rowlands, Dr. Rosenstock opined that Turpin has exertional limitations allowing her to occasionally lift and/or carry 20 pounds, frequently lift and/or carry 10 pounds, stand and/or walk about 6 hours in an 8-hour work day, and sit about 6 hours in an 8-hour workday. *Id.* Turpin's ability to push and/or pull was unlimited as well as her ability to reach. *Id.* Unlike Dr. Rowland's RFC, Dr. Rosenstock found Turpin's feeling to be unlimited. *Id.* Dr. Rosenstock further opined that limited handling (gross manipulation) and fingering (skin receptors). *Id.* In the previous RFC, Dr. Rowlands also found limited fingering but unlimited handling. (Tr. 289-296).

On April 10, 2013, Turpin visited Dr. Pucillo for a well women exam. (Tr. 369-372, 401-404). Turpin complained of joint pain in her neck and lower back pain during this visit. (Tr. 402).

On May 2, 2013, Turpin returned to One Step Diagnostic for an MRI of her lumbar spine revealing posterior disc herniations at L3/L4, L4/L5, and L5/S1 causing mild impingement on both existing nerve roots at those levels. (Tr. 332-333, 379-380, 393-384, 386-387, 411-412). Additionally, the MRI revealed multilevel mild to moderate facet joint disease. *Id.* A separate MRI of Turpin's cervical spine revealed loss

of hydration of the intervertebral discs at C4/C5 and C5/C6 with moderate disc narrowing

at these levels and multilevel posterior disc herniations.  (Tr. 334-335, 381-382, 388-389,

409-410).  At C5/C6, there was a mild mass effect upon the anterior aspect of the spinal

cord and multilevel nerve root impingement.  *Id.*  The MRI also revealed a 7 millimeter

cystic lesion to Turpin's left thyroid lobe.  *Id.*

On May 9, 2013, Turpin had a mammogram which revealed no significant

masses, calcifications, or other findings in either of her breasts.  It was recommended that

she consider annual mammography with tomosynthesis.  (Tr. 407).

On June 7, 2013, Turpin began seeing Dr. Abraham Thomas.  She complained of

low back pain that had been occurring for many years.  (Tr. 366, 433-434).  Turpin

described the pain as sharp, shooting, aching, and constant.  *Id.*  She claims that nothing

alleviates the pain and it is made worse by standing, sitting and walking.  *Id.*  Turpin also

complained of numbness, weakness and tingling of both upper extremities but denied

having any weakness, numbness or tingling of the lower extremities.  *Id.*  The doctor

performed a lumbar examination and found poor toe and heel walking, and diminished

deep tendon reflexes in the lower extremities.  *Id.*  The doctor also found the Waddell's

sign positive for axial compression and a straight leg raise positive, bilaterally.  *Id.*

Physical therapy was recommended for 2 weeks following this appointment.  *Id.*

Turpin visited Dr. Thomas' office on June 21, 2013, complaining she was only

able to sit, walk or stand for less than 30 minutes.  (Tr. 365-366, 396).  Her pain level at

worst was 7-9/10 and at best was a 4-6/10.  *Id.*  Turpin described the pain as a constant

burning and aching pain.  *Id.*  Dr. Thomas did not find any significant changes in the

physical exam since Turpin's last visit.  *Id.*

On June 28, 2016, Turpin had a thyroid ultrasound. (Tr. 416). There were no masses found on the right thyroid gland but the left thyroid gland contained a cyst off of the inferior pole. *Id.*

On July 2, 2013, Turpin began physical therapy at Methodist Hospital in Sugar Land. Turpin complained of achy pain in her lower pack which increased with prolonged standing or walking. (Tr. 345-347). She stated that she cannot sit for too long and must move around a lot. *Id.* Turpin claimed to require assistance with lifting, and said she avoids bending. *Id.* Turpin denied numbness or tingling in her legs and any problems with her bowel or bladder function. *Id.* The treatment plan for physical therapy was gait training, transfer training, bed mobility training, strengthening, and stretching her range of motion. *Id.* Additionally, the hospital recommended neuromuscular reeducation, manual therapy techniques, lumbar stabilization techniques and patient/family education. *Id.*

On July 8, 2013, Turpin visited Dr. Pucillo complaining of itchy and draining eyes, drainage in the back of her throat causing a cough, and congestion. (Tr. 398-399). Dr. Pucillo diagnosed her with an upper respiratory infection and an acute sore throat. *Id.* Turpin was prescribed Bromfed DM syrup for the upper respiratory infection and a strep screen was administered for the sore throat. *Id.*

Turpin returned for physical therapy on July 9, 2013 reporting a pain level of 7.5/10. (Tr. 348). She stated that level of pain was about normal for her but she did feel some relief after the evaluation. *Id.*

July 11, 2013, was Turpin's next physical therapy session where she stated she felt "good and must have slept well." (Tr. 350). The hospital reported Turpin had good

tolerance to the exercises given, was able to perform proper PPT and had good form with sit to stands.  *Id.*

On July 17, 2013, Turpin returned to physical therapy again and reported radiating pain into her right hip, which she stated was more painful than her lower back. (Tr. 351).  Turpin also stated she had neck pain that morning.  *Id.*  During the bridging exercise, Turpin claimed of increased lower back pain.  *Id.*  She reported that pain decreased a little since the start of therapy.  *Id.*

July 18, 2013 was Turpin's last visit to Methodist Hospital for physical therapy on record.  (Tr. 352).  During this visit, Turpin reported that her back aggravates her when she lays in bed sideways to watch television or movies for a long time.  *Id.*  She also reported a little pain down her leg that day.  *Id.*  The physical therapist reported that Turpin's transitions had slightly improved and the symptoms in her leg had slightly decreased by the end of the session.  *Id.*

Turpin returned to Dr. Thomas on July 19, 2013, and reported no improvement with physical therapy and requested steroid injections for treatment.  (Tr. 363-364, 395-396, 430-431).  At this appointment, Turpin stated that Advil decreased her pain.  *Id.*  Dr. Thomas noted no significant change in Turpin's physical examinations since her June 7, 2013 visit.  *Id.*

On July 22, 2013, Turpin visited Dr. Thomas, again, complaining of lower back pain that was radiating through both lower extremities.  (Tr. 360-363, 394, 427-428).

On August 12, 2013 and August 19, 2013, Turpin returned to receive the lumbar epidural steroid injections to which Turpin reported improvement in overall pain by less than a half.  (Tr. 354-359, 391-392, 424-425).

On August 25, 2013, Turpin sought treatment from Ben Taub Hospital reporting that she was experiencing radiating, and sharp pain in her lower back. (Tr. 452-459, 479-483). The emergency visit revealed a negative straight leg raise and no foot drop. *Id.* Turpin stated that she had not taken any oral medications such as Advil to try and relieve this pain. (Tr. 455). A physical exam revealed that Turpin exhibited tenderness in her lumbar back, but had a normal range of motion, no swelling, and no edema. (Tr. 454). An X-ray on August 26, 2013 showed probable posterior disc herniation at L4-L5 resulting in mild to moderate spinal canal stenosis and mild degenerative changes. (Tr. 450-451). There was no significant spinal canal or foramina stenosis. *Id.*

During an August 30, 2013, visit to The Back and Neck Clinic of Houston, Dr. Thomas found no significant changes in physical exam since Turpin's last visit. (Tr. 353, 391, 418-419). Dr. Thomas diagnosed lumbar facet/disc pain, lumbar radiculopathy, lumbar herniated nucleus pulpos, and lumbar spondylosis. *Id.* Dr. Thomas suggested she may need surgical evaluation. *Id.*

Turpin sought treatment from Ben Taub Hospital again on September 7, 2013. (Tr. 476-478). Her diagnosis was backache and she was prescribed 200 milligrams of sulindac and 750 milligrams of methocarbamol. *Id.*

On September 10, 2013, Turpin sought treatment from Dr. Ronald Pucillo who found tenderness to palpitation from the neck to the lumbar area upon physical examination and normal spinal curvature. (Tr. 465-467). Turpin displayed "good" finger flexibility, "good" strength bilaterally for both upper and lower extremities, and a normal gait. *Id.* Additionally, her reflexes were 2+ bilaterally and symmetric for both upper and lower extremities. *Id.*

16

Dr. Pucillo completed a Multiple Impairment Questionnaire (MIQ) on September 27, 2013.  (Tr. 440-447, 468-475).  In the MIQ, Dr. Pucillo indicated that Turpin suffers from lumbar radiculopathy and multilevel disc disease of the cervical and lumbar spine causing constant pain and weakness in her arms and legs.  (Tr. 440-441).  Dr. Pucillo also stated that Turpin has constant pain in her entire neck, upper back, lower back and down both of her legs that is worsened if standing, walking or sitting too long.  (Tr. 441-442).  In an eight-hour day, Dr. Pucillo indicated Turpin could only sit for 1-2 hours, and stand/walk for 1-2 hours, would need to get up and move around every 1-2 hours and would not be able to sit again for another 2-3 hours.  (Tr. 442-443).  Additionally, the doctor indicated Turpin could never lift nor carry anything, has significant limitations in doing repetitive reaching, handling, fingering or lifting, and is essentially precluded from grasping, turning and twisting objects.  *Id.*  The MIQ also indicated Turpin was marked to moderately limited to using her fingers/hand for fine manipulations, and using her arms for reaching.  (Tr. 444).  Dr. Pucillo opined that Turpin is capable of tolerating only low stress due to emotional symptoms, and would be absent from work more than three times a month.  (Tr. 446).  Dr. Pucillo wrote that he relied on MRIs from May 2013 and September 2011 in completing the MIQ and that Turpin's limitations "possibly" date back to 2011.  (Tr. 441-446).

Dr. Pucillo completed an Attending Physician Statement on May 9, 2014, finding multilevel disc herniation in Turpin's cervical and lumbar spine as well as carpal tunnel as her primary diagnosis.  (Tr. 484-485).  Dr. Pucillo found palpated tenderness in the lumbar area and cervical spine and MRI changes in the lumbar and cervical spine.  *Id.*

Dr. Pucillo suggested that Turpin can only sit or stand for a very limited time before she has to lay down. *Id.*

On May 21, 2014, Dr. Pucillo completed a Capabilities and Limitations Worksheet. (Tr. 487-488). Dr. Pucillo indicated Turpin could never climb, crawl, kneel, lift, pull, push, carry, bend, or twist but could occasionally reach forward or above her shoulders. *Id.* Dr. Pucillo also noted that Turpin never had firm hand grasping or even hand grasping in either her left or right hands. *Id.* Turpin occasionally had fine manipulation, gross manipulation, repetitive motion, and could occasionally sit, stand and walk. *Id.* Dr. Pucillo added that she could sit or stand for 1-2 hours but then she must lay down for 2-3 hours before she can get up again. *Id.*

Dr. Pucillo completed a Disability Impairment Questionnaire regarding Turpin on October 17, 2014. (Tr. 489-493). Turpin's diagnosis was multilevel posterior disc herniations at L3-5, lumbar radicalopathy, multilevel posterior cervical spine herniations with nerve impingements and a thyroid cyst. Dr. Pucillo's findings to support this diagnosis were Turpin's chronic back pain that often radiates down her legs, her carpal tunnel syndrome in both arms, and the MRI changes seen in the cervical and lumbar spine areas. *Id.* Turpin's pain is present when she is sitting, standing, or laying down. *Id.* Dr. Pucillo wrote that her arms are painful at night with a persistent numbness. *Id.* The doctor believes the patient's symptoms will last at least 12 months and that Turpin is not a malingerer. *Id.* Turpin's primary symptoms were constant pain in the entire back and neck, weakness in her arms and legs, her inability to stand for long periods of time, and paresthesias in her feet and fingers. *Id.* Dr. Pucillo claims Turpin can only sit or stand for 1-2 hours, must move around every 1-2 hours and cannot return to a seated

position for another 2-3 hours stating also that it is medically necessary for Turpin to avoid continuous sitting in an 8-hour workday. *Id.* The doctor also found that Turpin can never lift nor carry 0-5 pounds. *Id.* Additionally, Dr. Pucillo found Turpin is moderately to markedly limited to reaching, handling, fingering, and fine manipulations. Turpin is markedly limited to grasping, turning, and twisting objects. *Id.* Dr. Pucillo believes Turpin's symptoms will worsen if she is placed in a competitive work environment and that she will frequently experience symptoms severe enough to interfere with her attention and concentration. *Id.* Additionally, the doctor believes Turpin will miss work more than three times a month as a result of her impairments, which date back as far as "possibly 2001." *Id.* Dr. Pucillo does not think emotional factors contributed to the severity of Turpin's symptoms. *Id.*

On November 1, 2014, Turpin sought emergency treatment from Methodist Hospital in Sugar Land. (Tr. 8-29). The discharge instructions advised Turpin to increase restricted activities as tolerated with the use of a walker, avoid heavy lifting, bending or twisting, and to maintain good body mechanics. *Id.* The discharge instructions indicated Turpin had a pain level of 3 and diagnosed her with lumbar radiculopathy. *Id.* Turpin was prescribed cyclobenzaprine, diazepam, and Tylenol with Codeine to take as needed to relieve pain.

In addition to Turpin's medical records, the ALJ considered her body habitus. When the claimant first sought treatment in September 2011, she weighed 165 pounds with a height of five feet. (Tr. 263). In September 2014, Turpin weighed 178 pounds. (Tr. 466). Therefore, based on the formula created by the National Institutes of Health (NIH), Turpin's body mass index has been in excess of 32 and indicative of obesity at all

times relevant to this decision.  However, as discussed throughout her medical record, there has been no evidence of cardiovascular or respiratory issues or abnormalities of gait.  The ALJ, nevertheless, took this aspect into consideration.  (Tr. 43).

Here, substantial evidence supports the ALJ's findings that Turpin's carpal tunnel syndrome, degenerative disc disease of the cervical and lumbar spine, and obesity were severe impairments at step two, and that such impairments at step three, individually or in combination, did not meet or equal a listed impairment.

RFC is what an individual can still do despite her limitations.  It reflects the individual's maximum remaining ability to do sustained work activity in an ordinary work setting on a regular and continuing basis.  SSR 96-8p, 1996 WL 374184, at *2 (SSA July 2, 1996).  The responsibility for determining a claimant's RFC is with the ALJ. *See Villa v. Sullivan*, 895 F.2d 1019, 1023-24 (5th Cir. 1990).  The ALJ is not required to incorporate limitations in the RFC that she did not find to be supported by the record. *See Muse v. Sullivan*, 925 F.2d 785, 790 (5th Cir. 1991).  Here, the ALJ carefully considered all of the record in formulating an RFC that addressed Turpin's physical impairments.  The ALJ's RFC determination is consistent with Dr. Lee's, Dr. Thomas', and Dr. Pucillo's consultative examinations, the treatment records, and the record as a whole.  The ALJ thoroughly discussed the medical evidence, and Turpin's testimony.  He explained how specific evidence supported his RFC assessment.  The ALJ also discounted Turpin's subjective complaints, finding that she was not entirely credible. The ALJ articulated the reasons supporting her decision and tied the findings in his RFC assessment to the totality of the record evidence.  The ALJ, taking into account Turpin's impairments, concluded that Turpin could perform light work restricted to the extent that

20

she could lift and/or carry ten pounds frequently and 20 pounds occasionally, stand and walk for 4 of 8 hours, each, and sit for six or eight hours, for a full eight-hour day. Her ability to push/pull and her gross and fine dexterity are unlimited with the exception of frequent use of the hands, bilaterally. Additionally, the ALJ found that she could occasionally climb stairs, bend, stoop, crouch, crawl, balance, twist, and squat. She could occasionally be exposed to dangerous machinery. She has no mental impairments. This factor weighs in favor of the ALJ's decision.

### b. Diagnosis and Expert Opinions

The second element considered is the diagnosis and expert opinions of treating and examining physicians on subsidiary questions of fact. The law is clear that a "treating physician's opinion on the nature and severity of a patient's impairment will be given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with…other substantial evidence." *Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000). The ALJ may give little or no weight to a treating source's opinion, however, if good cause is shown. *Id.* at 455-56. The Fifth Circuit in *Newton* described good cause as where the treating physician's evidence is conclusory, is unsupported by medically acceptable clinical, laboratory, or diagnostic techniques, or is otherwise unsupported by the evidence. *Id.* at 456. "[A]bsent reliable medical evidence from a treating or examining physician controverting the claimant's treating specialist, an ALJ may reject the opinion of the treating physician only if the ALJ performs a detailed analysis of the treating physician's views under the criteria set forth in 20 C.F.R. § 404.1527(d)(2)." *Id.* at 453. The six factors that must be considered by the ALJ before giving less than controlling weight to the opinion of the

treating source are: (1) the length of treatment relationship; (2) frequency of examination;
(3) nature and extent of the treatment relationship; (4) the support of the source's opinion
afforded by the medical evidence of record; (5) the consistency of the opinion with the
record as a whole; and (6) the specialization of the source.  20 C.F.R. § 404.1527(d)(2);
*Newton*, 209 F.3d at 456.  An ALJ does not have to consider the six factors "where there
is competing first-hand medical evidence and the ALJ finds as a factual matter that one
doctor's opinion is more well-founded than another," and "where the ALJ weighs the
treating physician's opinion on disability against the medical opinion of other physicians
who have treated or examined the claimant and have specific medical bases for a contrary
opinion." *Id*. at 458; *Alejandro v. Barnhart*, 291 F. Supp.2d 497, 507-11 (S.D.Tex.
2003).  Further, regardless of the opinions and diagnoses of medical sources, "the ALJ
has sole responsibility for determining a claimant's disability status." *Martinez v.
Chater*, 64 F.3d 172, 176 (5th Cir. 1995).  "The ALJ's decisions must stand or fall with
the reasons set forth in the ALJ's decision, as adopted by the Appeals Council." *Id*. at
455; *see also Cole v. Barnhart*, 288 F.3d 149, 151 (5th Cir. 2002) ("It is well-established
that we may only affirm the Commissioner's decision on the grounds which [she] stated
for doing so.").  However, perfection in administrative proceedings is not required. *See
Mays v. Bowen*, 837 F.2d 1362, 1364 (5th Cir. 1988).

Here the thoroughness of the ALJ's decision shows that he carefully considered
the medical records and testimony, and that his determination reflects those findings
accurately.  The ALJ summarized the evidence and set forth specific reasons concerning
the weight given to the opinions of the medical sources.

Turpin contends that the ALJ erred by discounting the opinion of Dr. Pucillo, her treating physician, and giving greater weight to the opinions of the two State Agency doctors. The Commissioner responds that the ALJ properly weighed all of the medical opinions with "thorough consideration" to reach an appropriate assessment of Turpin's impairments.

With respect to the opinions and diagnoses of treating physicians and medical sources, the ALJ wrote:

> In filing the application for Social Security benefits, the claimant alleged limitations in her ability to work due to carpal tunnel on her hands. The claimant also testified that she stopped working because she underwent surgery on both hands. She states she continued to have numbness and tingling of her left hand after surgery. She testified that her right hand is starting to "fall asleep." Additionally, the claimant testified to having ongoing neck and back pain. The claimant subsequently rated the intensity of her pain symptoms as being 4 to 5 with medications. The claimant indicated, however, that she takes prescribed medication *infrequently* as it makes her breakout, and she is unable to afford additional treatment because her insurance does not over her back symptoms.

> The claimant subsequently testified that secondary to symptoms, she is able to lift no more than a gallon of milk, or type longer than 15 minutes before having to rest. The claimant also testified that she has been diagnosed as having high blood pressure, but is not taking any medications for the symptoms.

> After careful consideration of the evidence, I find the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely credible for the reasons explained in this decision. The evidence of record fails to support the claimant's allegations of ongoing and disabling pain. Factors for consideration in evaluating an individual's subjective complaints of pain include whether there is documentation of persistent limitations of range of motion, muscle spasms, muscular atrophy from lack of use, significant neurological deficits, weight loss or impairment of general nutrition, and non-alleviation of symptoms by medication. *Hollis v. Bowen*, 837 F.2d 1378, 1384 (5th Cir. 1988); and *Adams v. Bowen*, 883 F.2d 509, 512 (5th Cir. 1987). None of the

claimant's examinations has disclosed any of the above findings to any significant degree. Records submitted by treating sources also fail to document any objective clinical or diagnostic findings that would preclude the performance of light work as set forth in this decision.

For example, the evidence of record establishes that the claimant presented for treatment in September 2011 with complaints of pain, numbness, tingling and weakness of her hands that had been present for 1 year. On examination, Phalen's tests were positive, bilaterally, as were Durkan's or compression tests. The claimant, however, had no swelling, edema or deformities of the hands. There was no obvious atrophy of the thenar, hypothenar or intrinsic muscles. Range of motion was also full in the wrists and fingers with no evidence of triggering. Tinel's and Finkelstein's tests were negative. The examiner also noted that the claimant demonstrated only a **mild** decrease in grip and pinch strength (Exhibit 1F, page 2). An electromyoprphy/nerve conduction study also revealed a **mild** sensory demyelinating median mononeuropathy at the left wrist; and a moderate sensorimotor demyelinating median mononeuropathy at the right wrist. There was no evidence of any cervical radiculopathy or other focal nerve entrapment (Exhibit 1F, pages 18 and 19; and Exhibit 3F, pages 2 through 9).

\*                                        \*

Contrary to the claimant's allegations of ongoing and disabling symptoms, the record also contains no evidence of any treatment during the period from September 19, 2012 to May 2013.

\*                                        \*

The medical record, as discussed above, fails to support the claimant's allegations of ongoing and disabling symptoms. The Courts have held that the Administrative Law Judge may properly consider the objective medical evidence in testing credibility and finding the subjective complaints exaggerated. *Johnson v. Heckler*, 767 F.2d 180 (5th Cir. 1985).

The claimant has also acknowledged activities of daily living that are inconsistent with her allegations of ongoing and disabling symptoms. Specifically, the claimant testified that she cares for her personal needs, cooks, shops, performs household chores, reads, and utilizes a computer to pay bills, read emails, and plays Candy Crush. The claimant also testified that she visits with friends, and occasionally goes to the movies with her mother. The claimant, in fact, testified that during the evening prior to the hearing, she and friends had attended their children's football practice. In written statements completed for the record, the claimant also indicated

that she takes care of her personal needs without difficulty, transports her children to and from school, prepares meals several times a week, performs household chores, shops, visits with her brother on a regular basis and attends her son's football games (Exhibits 7E and 9E).

The Courts have held that the performance of household chores and other daily activities may be considered in evaluating the credibility of the claimant's functional limitations. *Reyes v. Sullivan*, 915 F.2d 151 (5th Cir. 1990). I find the claimant's actual daily activities reveal a significantly greater physical functional ability than alleged.

I am cognizant, however, that an individual's daily activities and the objective evidence are only two factors taken into consideration in reaching a conclusion regarding credibility. Other factors include the opinions, clinical and laboratory findings, the extent of medical treatment and relief from medication and therapy, the claimant's work history, attempts to seek relief from symptoms, and the extent, frequency, and duration of symptoms. Taking all of these factors into consideration, I find the claimant's allegation of an inability to perform all work activity to be unsupported.

As for the opinion evidence, I am aware that Ronald Pucillo, M.D. completed a Multiple Impairment Questionnaire in September 2013 indicating that the claimant had lumbar radiculopathy and multilevel disc disease of the cervical and lumbar spine with constant pain and weakness of her arms and legs (Exhibit 11F, pages 1 and 2). The doctor subsequently indicated that secondary to symptoms, the claimant was unable to lift any appreciable amount of weight, and could sit for 1 to 2 hours in an 8-hour workday, and stand/walk for 1 to 2 hours in an 8-hour workday. Indicating that the claimant could not sit continuously, the doctor opined that the claimant needed get up and move around as frequently as every 1 to 2 hours.

Dr. Pucillo also indicated that the claimant had marked limitations (essentially precluded) in her ability to grasp, turn and twist objects, bilaterally; and had moderate (significantly limited but not precluded) to marked limitations in her ability to reach and use her fingers/hands for fine manipulations. The doctor also indicated that the claimant was precluded from pushing, pulling, kneeling, bending and stooping. According to the doctor, the claimant's condition interfered with her ability to keep her neck in a constant position and she was unable to perform a full time competitive job that required the activity on a sustained basis.

Dr. Pucillo also indicated that the claimant was capable of only low stress based on emotional symptoms. Additionally, the doctor indicated that the claimant needed to take unscheduled breaks as frequently as every 1 to 2

hours and lasting for 2 to 3 hours; and secondary to treatment [for] her impairment, the claimant would be absent from work on an average of more than 3 times a month. The doctor indicated that the claimant had been limited as set forth in his assessment since "possibly" 2011 (Exhibit 11F and Exhibit 14F, pages 4 through 11).

Little weight, however, is accorded to this opinion as Dr. Pucillo failed to provide any objective findings to support his conclusions. Moreover, the doctor's assessment is inconsistent with his own objective findings noted during his examinations of the claimant. Specifically, the record reflects no treatment by Dr. Pucillo prior to April 2013, yet her proffers an opinion on disability back to 2011, a time when he had not even treated her. According to the doctor's records, when seen on April 10, 2013, the claimant complained of bloating (Exhibit 8F, page 17). On examination, Dr. Pucillo noted, however, that the claimant had no respiratory, cardiovascular, abdominal or genitourinary abnormalities. There is no evidence that the doctor performed any musculoskeletal or neurological examinations (Exhibit 8F, page 18). Dr. Pucillo also failed to report any musculoskeletal or neurological abnormalities during examinations performed in July 2013 (Exhibit 10F, page 2).

As discussed earlier, during an examination performed on September 10, 2013, the date of the assessment, the doctor noted the claimant's subjective complaints of neck and back pain. On examination, however, he indicated that the claimant had only tenderness to palpation from her neck to her lumbar area with no evidence of any reflex loss. According to the doctor, the claimant's motor strength was good and her gait was normal. The claimant also displayed good flexibility of her fingers (Exhibit 14F, page 2). Given the above, Dr. Pucillo's extreme limitations in his assessment are not considered to be reflective of treatment records or the claimant's ability to function as reflected by her own rather extensive daily activities.

A State Agency medical consultant also completed a Physical Residual Functional Capacity Assessment at the initial level indicating that the claimant had no exertional, postural, visual, communicative or environmental limitations. The doctor indicated, however, that the claimant was limited to occasional fingering and feeling, bilaterally, due to carpal tunnel syndrome (Exhibit 2F). I give this opinion some weight but find 'frequent' bilateral hand ability and a light exertional level more consistent with the objective medical record.

At the reconsideration level, a State Agency medical consultant completed a Residual Functional Capacity Assessment indicating that the claimant was able to lift and/or carry 10 pounds frequently and 20 pounds occasionally, stand and/or walk for a total of about 6hours, and sit for a

total of about 6 hours in an 8-hour workday. According to the doctor, the claimant was limited to only occasional handling and fingering on the left (Exhibit 4F).

I give some weight to the opinions rendered by the State Agency medical consultants; however, based on the longitudinal record, including the claimant's statements regarding daily activities, it is concluded that she is limited to light work as set forth in my established residual functional capacity.

In sum, the residual functional capacity is supported by the longitudinal medical records and the claimant's activities of daily living. The claimant's activities of daily living are not limited and include a wide variety of physical and social activities. While the claimant's impairments are severe in that they have more than a minimal effect on her ability to function, they are not totally disabling and do not preclude the performance of all substantial gainful activity. (Tr. 39-45).

With respect to Dr. Pucillo's opinion, the ALJ found no objective findings consistent with Dr. Pucillio's opinion to support his conclusions. Turpin's limitations opined by Dr. Pucillo exceed the limitations supported by Turpin's medical history and diagnosis.

The ALJ's decision is a fair summary and characterization of the medical records. Given the proper discounting of Dr. Pucillo's opinion concerning Turpin's physical limitations, and the medical opinions which do support the ALJ's residual functional capacity determination, upon this record, the Court concludes that the diagnosis and expert opinion factor also supports the ALJ's decision.

### c. Subjective Evidence of Pain

The next element to be weighed is the subjective evidence of pain, including the claimant's testimony and corroboration by family and friends. Not all pain is disabling, and the fact that a claimant cannot work without some pain or discomfort will not render

him disabled. *Cook*, 750 F.2d at 395. The proper standard for evaluating pain is codified in the Social Security Disability Benefits Reform Act of 1984, 42 U.S.C. § 423. The statute provides that allegations of pain do not constitute conclusive evidence of disability. There must be objective medical evidence to cause pain. Statements made by the individual or his physician as to the severity of the plaintiff's pain must be reasonably consistent with the objective medical evidence on the record. 42 U.S.C. § 423. "Pain constitutes a disabling condition under the SSA only when it is 'constant, unremitting, and wholly unresponsive to therapeutic treatment.'" *Selders*, 914 F.2d at 618-19 (citing *Farrell v. Bowen*, 837 F.2d 471, 480 (5th Cir. 1988)). Pain may also constitute a non-exertional impairment which can limit the range of jobs a claimant would otherwise be able to perform. *See Scott v. Shalala*, 30 F.3d 33, 35 (5th Cir. 1994). The Act requires this Court's findings to be deferential. The evaluation of evidence concerning subjective symptoms is a task particularly within the province of the ALJ, who has had the opportunity to observe the claimant. *Hames*, 707 F.2d at 166.

Here, Turpin testified about her health and its impact on her daily activities. She testified that she cannot sit for longer than 30 minutes, nor can she walk or stand for longer than 15-30 minutes. (Tr. 76). Turpin stated that she can lift a gallon of milk, which would be about eight and a half pounds. *Id.* She is able to drive, and did so the day before the hearing. *Id.* She is able to go to the grocery store, post office, and bank often. (Tr. 76-77). Turpin is able to do basic household chores such as laundry, dishes, cooking, dusting, sweeping, and vacuuming. (Tr. 77). She is able to make the beds but unable to move heavy furniture for vacuuming. (Tr. 83). Turpin's mother frequently visits her and they will go to lunch and the movies together. (Tr. 78). The night before

her hearing, Turpin attended her children's football and cheerleading practices with two friends. (Tr. 79). She is able to use a computer to pay bills, check emails and Facebook, and keep up with current news. (Tr. 80). However, using the computer occasionally bothers her hands after typing for only fifteen minutes. (Tr. 83). Turpin identified pain as the biggest thing that prevents her from working and believes "no job is going to hire [her] with [her] standing, sitting, walking around, moving around every 5 to 10, 15, 20 minutes." (Tr.82).

The ALJ rejected Turpin's testimony as not fully credible. The undersigned finds that there is nothing in the record to suggest that the ALJ made improper credibility findings, or that he weighed the testimony improperly. Accordingly, this factor also supports the ALJ's decision.

### d. Age, Education, and Work History

The final element the ALJ must consider is the claimant's educational background, work history, and present age. According to the the Code, a claimant will be determined to be disabled only if the claimant's physical or mental impairments are of such severity that she is not only unable to do her previous work, but cannot, considering her age, education, and work experience, engage in any other kind of substantial work which exists in the national economy. 42 U.S.C. § 423(d)(2)(A).

The record shows that the ALJ questioned Mr. King, a vocational expert ("VE"), at the hearing. "A vocational expert is called to testify because of his familiarity with job requirements and working conditions. 'The value of a vocational expert is that he is familiar with the specific requirements of a particular occupation, including working conditions and the attributes and skills needed." *Vaughan v. Shalala*, 58 F.3d 129, 131

(5th Cir. 1995) (quoting *Fields v. Bowen*, 805 F.2d 1168, 1170 (5th Cir. 1986)). It is well settled that a vocational expert's testimony, based on a properly phrased hypothetical question, constitutes substantial evidence. *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994). A hypothetical question is sufficient when it incorporates the impairments which the ALJ has recognized to be supported by the whole record. Beyond the hypothetical question posed by the ALJ, the ALJ must give the claimant the "opportunity to correct deficiencies in the ALJ's hypothetical questions (including additional disabilities not recognized by the ALJ's findings and disabilities recognized but omitted from the question)." *Bowling*, 36 F.3d at 436.

The ALJ posed the following hypothetical questions to the VE:

Q. I'm going to find exertional ability to occasionally lift 20 pounds, 10 pounds frequently; stand and walk four of eight each; sit six of eight, for a full eight-hour day; push/pull, gross/fine is unlimited except for frequent use of the hands bilaterally; occasional stairs; no ladders, ropes, scaffolds, or running; occasionally bend, stoop, crouch, crawl, balance, twist and squat; occasional exposure to dangerous machinery. There's no mental impairments. With those in mind, can she do any past work?

A. Under the hypothetical, she could perform the past work of medical records clerk but not the supply clerk, Judge.

Q. Okay. Now, transferables, anything?

A. She has -- based on past work, she has acquired work skills to [do] other work. (Tr. 85).

Q. Okay. Give me a few of those skills, sir.

A. She has, of course, record keeping skills, medical terminology skills, computer skills, clerical skills. Those would be the primary skills.

Q. And what, what types of specific jobs would those skills transfer into?

A. I think it would be other clerical jobs. Examples that she could perform, other jobs, these would be at the light semiskilled work base, Judge, she could work as a -- excuse me -- as a, general office clerk. This

would be DOT code 209.562-010, and there would be around 3,000 of these jobs in the regional economy, which would be Harris County and five surrounding counties. For the national economy, there would be 385,000. A second example would be a, a, a return-to-factory clerk, DOT code 209.587-042, and there would be around 2,000 of these jobs in the regional economy. For the national economy, there would be 350,000. And a third example would be a route delivery clerk, DOT code 222.587-034, and there would be around 2,000 of these jobs in the regional economy. For the national economy, there would be 365,000. (Tr. 86).

Turpin's counsel then had the following questions for the VE:

Q. Mr. King, if --

A. Yes, ma'am?

Q. -- an individual were, if an individual were limited to occasional handling and fingering, how would that affect their ability to perform the claimant's past job as a medical records clerk as well as the three jobs you've listed?

A. Those jobs would, would be done at a frequent basis.

Q. Okay. Now, if an individual would need rest breaks to lay down occasionally, how would that affect their ability to perform these jobs?

A. If the person had to take rest breaks beyond the standard 15-minute break in the morning, lunch break, 15 in the afternoon, they could not maintain these jobs.

Q. And if an individual were missing more than three days of work a month due to ailments, how would that effect their ability to maintain these jobs?

A. Missing three or more days, they could not sustain or maintain those jobs during that period. (Tr. 86-87).

Here, the ALJ relied on a comprehensive hypothetical question to the vocational expert. A hypothetical question is sufficient when it incorporates the impairments which the ALJ has recognized supported by the whole record. Upon this record, there is an accurate and logical bridge from the evidence to the ALJ's conclusion that Turpin was

not disabled.  Based on the testimony of the vocational expert and the medical records, substantial evidence supports the ALJ's findings that Turpin could perform work as a medical records clerk, general office clerk, return-to-factory clerk, and route delivery clerk.  The Court concludes that the ALJ's reliance on the vocational expert's testimony was proper, and that the vocational expert's testimony, along with medical evidence, constitutes substantial evidence to support the ALJ's conclusion that Turpin was not disabled within the meaning of the Act and therefore was not entitled to benefits.  Further, it is clear from the record that the proper legal standards were used to evaluate the evidence presented.  Accordingly, this factor also weighs in favor of the ALJ's decision.

## VI.       Conclusion and Order

After reviewing the record in entirety, the undersigned is of the opinion that the ALJ and the Commissioner properly used the guidelines set forth by the Social Security Administration, which directs a finding of "not disabled" based on these facts.  *See Rivers v. Schweiker*, 684 F.2d 1144 (5th Cir. 1982).  As all the relevant factors weigh in support of the ALJ's decision, and as the ALJ used the correct legal standards, the Court ORDERS that Defendant's Cross Motion for Summary Judgment (Document No. 15) is GRANTED, the Plaintiff's Motion for Summer Judgment (Document No. 13) is DENIED, and the Commissioner's decision is AFFIRMED.

Signed at Houston, Texas, this ___14th___ day of ___July___, 2016.

_____
FRANCES H. STACY
UNITED STATES MAGISTRATE JUDGE